The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nine and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you, Your Honor, and may it please the Court. Global warming is a complex and important problem that implicates all states and all nations and all people around the world, but it raises issues of national and international scope and can't be decided under state forecloth. That's why this case belongs in federal court. We've raised a number of issues regarding removal on this appeal and we believe they're all properly before the Court, but I'd like to start with the one issue that everyone agrees is properly before the Court, the Federal Officer Removal Issue. And if, and if we think that that is the only proper issue before the Court, what is your argument that anything else would be, should be considered? Your Honor, our argument that the other issue should be considered because Section 1447D provides that remand orders regarding Section 1442 are reviewable under, can be reviewed on appeal and it talks about orders. Doesn't that run afoul of our precedent in Noel? Well, Your Honor, Noel was decided before Section 1442 remand orders were made appealable, so the Court didn't address that precise issue and it was also decided before the Supreme Court, which dealt with Section 1292B interlocutory appeal issues, but really it was the same issue there. The question was whether an order that had been certified based on certain controlling issues brought up the entire order or just the controlling question. And the Supreme Court, Justice Ginsburg, said very clearly that no, the whole, the language of the statute was order and order means the full order, not the issues. And we believe that the same exact analysis would apply here and that Noel doesn't bind the Court because it just didn't really have the opportunity to address those issues. What, if anything, does the Removal Classification Act of 2011 do to Noel? I think it really changes the inquiry, Your Honor, because it did two things. It, for the first time, made a remand order made where Section 1442 Federal Office of  Removal, so Noel hadn't been, wasn't able to address this particular issue. The other thing about the Removal Classification Act is, as the Federal Office of Removal, and I'll come back to this, it broadened the scope of it even further by relaxing the causation standards. And I think that's the place where the District Court got it wrong on the Federal Office of Removal issue. The Court applied to, as this Court said in the Sawyer case, the District Court here, just like there, applied too strict a causation test as the Federal Office of Removal. So what do you, how relaxed is the Federal Office of Removal test now, in your view? Well, this Court put it, I think, exactly right in the Sawyer case in 2017, that the test is whether there's a connection or association between the act under a Federal Officer and the claim. And here, that's clear, the test is clearly met. The District Court assumed we met that standard, that there were acts under a Federal Officer. What acts? Fossil fuel production? Yes. Is that the act you're talking about? Yes, Your Honor. And here, there was... Go ahead. Oh, no, go ahead. No, you go ahead. I was going to say, fossil fuel production is a heart and soul of the plaintiff's complaint. They're challenging fossil fuel production around the globe, going back to World War II and beyond. And it includes actions where, for example, the Elk Hill Naval Reserve, where Standard Oil had this very detailed partnership, joint venture agreement with the Navy, where it was operating the Naval Reserve, producing under strict controls from Elk Hill. Well, has that reserve... Has that actually ever been used? That reserve? Yes, Your Honor. It's been... It was, for many years, and under the control of the Navy, Standard operated there. It managed it, in part, for the Navy. There was an effort to protect the reserves for times of war. And so, Standard was acting under the strict controls of the Navy. So, you're saying, without the federal government, the fossil fuel production could not have occurred? That's... Or would not have occurred? That's not the test, Your Honor. So, without the... But what... Would it have occurred without the federal government or the Navy? It... The... I understand you're saying that's not the test. Yes. But my question is, would it... So, would have... Standard Oil would have still produced its fossil fuel products? Not there, Your Honor. Because the government... The history of it's pretty interesting. The government was going to, basically, condemn Elk Hill because of World War II. And including taking away private rights that Standard Oil had at the time. Instead of doing that, the statute enacted was to make Standard Oil really an off... Acting under the agency and the government, and the Secretary of Navy, helping the government... This is exactly what the Supreme Court in Watson said was the test. Do things that it would otherwise have done in itself. In itself. You raised three contractual relationships, and one of them being this naval issue. Which is the strongest of your argument for the phrase, acting under? Your Honor, I think Elk Hill is very strong. But the Outer Continental Shelf leases... And we gave you the court there, in the record, a couple of them. The Outer Continental Shelf itself is governed by federal law. 30% in some years of the domestic production of oil in this country comes from the Outer Continental Shelf. The Parker drilling case from the Supreme Court talks about how the statute was meant... The Outer Continental Shelf Lands Act was meant to ensure that the federal government had control and authority over that area. So it could produce minerals and extract minerals. Explain to me how that is acting under federal officers. Your Honor, the leases, and there are a couple of them in the examples in the record, where the Secretary of the Interior is mandated by the statute to expeditiously and in an orderly fashion maximize production from the Outer Continental Shelf. And to Judge Thacker's point, rather than doing it itself, it contracted with companies to do it on its behalf, either for a royalty or for the government to get oil itself if it needed it. It had a right to certain amounts if it chose to. And so, Judge Floyd, it really is a situation where the oil companies are acting to do what Watson said, carrying out the statutory mandate to extract those resources, pursuant to specific guidelines and specific requirements that the government imposed. So it's a government contract relationship. And in the Sawyer case, I think the court pointed to those sorts of relationships as providing acting under jurisdiction, where, as here, the company is acting to assist the government. The government doesn't have oil and gas engineers and drilling equipment to the degree these companies do, so it contracts with companies like Standard and Chevron and other companies who are defendants here to help it do that for it. And that's the classic acting under jurisdiction. And on the causation question, just briefly, the district court said, well, there couldn't be federal officer removal jurisdiction because the plaintiff did argue that the total production that caused global warming occurred under the auspices of the federal government. But that's not the test. Clearly, if they had brought a case that just targeted activities by a defendant under the federal officer authority, there would be federal jurisdiction. And this is jurisdiction. We don't need a lot of federal jurisdiction. We just need some. And clearly, it's been triggered by that and all the activities on the outer continental shelf. That's another area where the Supreme Court has said it. The Fifth Circuit and the Deepwater Horizon and other cases have said it's a broad grant of federal jurisdiction. And there's no question. It's so broad, and based on your argument, you equate agency with being an official. Well, I'm following the extent of your logic. That is, you have an agency, if you will, in terms of carrying out a function that's in the interest of the government. That makes you an official. If you're acting under an official, Your Honor, and that's the test. And so it's not that you necessarily become an official, but that under Section 1442, the company is acting under an officer and subject to their control and direction. And that's what we have at Elk Hill. And then when we get to the outer continental shelf, Your Honor, it doesn't even matter. Isn't that control wielded mostly through regulation? No, Your Honor. And here, like, for example, the Elk Hill example, it was a detailed operating agreement. So it wasn't like Watson, where it was just regulation by the FDA or some other agency. And it was requirements that Elk Hill, the Navy, exclusive control to control the operations of standard in operating that reserve. And just briefly, on the outer continental shelf, there's no requirement that there be an acting under a federal officer. And here, the plaintiffs have targeted oil production and emissions around the world. And I said the amount from the outer continental shelf is significant, 30% in some years. And so clearly there's jurisdiction. They're seeking to punish oil and gas production on federally controlled land that's subject to federal law. That provides federal jurisdiction under that statute as well. The third point I'd like to make is our federal common law argument. Because, as I mentioned, global warming is important, but it is interstate, it's international. And the Supreme Court has held over and over again that some areas, some causes of action, because of their interstate and international character, state law can't apply. Federalism principles, the power of a state, one state can't regulate the activities, the oil production or the emissions in another state, let alone all 50 plus the rest of the world. So as Texas Industries held, the Supreme Court said, that's an area where state law can't apply, and then what body of law do we look to? It's a choice of law question, federal law. And the Supreme Court has said in ADP, in Milwaukee One, many of the cases we've cited, that we're talking about a claim based on ambient air or water in the interstate flow, federal common law is the body of law we look to. And therefore we respectfully submit, these claims arise under federal law, federal common law. And the plaintiffs have argued and the district court found we were really making a preemption argument, but we're not. We're arguing that step one, under the standard oil decision, is what body of law applies. Then we get to the merits. We're on a motion to dismiss. But here the question is, what law applies? It's a pure choice of law question. Maryland law can't apply to the activities around the world or around the United States. We know there are choice of law questions here. So the first question for purposes of removal jurisdiction is what law applies, based on the well-depleted complaint. And if we just take away the label, which is appropriate, and just look at the allegations, this tort involves oil and gas production around the United States, federal land, and everywhere else, around the world, in other countries. So it raises foreign policy questions, implicates international negotiations. It sounds a lot like preemption to me. You're saying, per se, if these things are filed, they have to go to federal court. That sounds like preemption to me. We do have a preemption argument, Your Honor, but that relates to the Clean Air Act. Here, my guiding case in this analysis, really, in terms of this choice of law question, is I go back to the standard oil case, which was cited in AEP, where the government argued that federal common law should govern its claim to get back some money. Let's go back to Yamaha for just a moment. Yamaha didn't involve a remand order, nor did it interpret the scope of 1447D. Is that correct? That's correct, Your Honor. It was interpreting Section 1292B, the interlocutory order, but courts like the Seventh Circuit in the Lou John Hong case, the Sixth Circuit in the Mays case, Wright and Miller, the treatise, all come to the conclusion, and I think it's correct, that the same analysis applies. Section 1447D says certain orders are not appealable and certain orders are. And we have to assume they were using the word order the same way in that very short statute, and it refers to the orders, not the issues. And that's how this court, ordinarily, that's the ordinary rule. The Chamber of Congress brief does a nice job of noting that this court and the federal courts hear appeals of judgments and orders, not particular issues, and that's a common theme, and that's what Congress did in Section 1447D when it amended it. And just one more point on the common law question, just to finish it up. In the AEP decision, which found displacement of a federal common law claim for global warming, the Supreme Court said that global warming is an issue of international policy, national policy. It's a complex balancing. Congress had delegated that to the EPA. Therefore, the federal courts shouldn't start creating nuisance claims. It's inconceivable that the court intended that with that ruling to turn loose 50 states under these vague nuisance-type claims to start regulating global activity. That's why we believe this is a federal issue, belongs in federal court, and with that, I'll reserve the rest of my time for rebuttal. Thank you. Mr. Scheer? Please report. I'm Vic Scheer, and I represent the city of Baltimore. The court's review is limited to the federal officer issue, and there is no federal officer jurisdiction, and we can talk about federal common law, but it's a matter, I think, of academic interest. Well, opposing counsel's argument does have some intuitive appeal in as much as when you're talking about global impact, how and why does a single state get to preside over that case? Yes, Judge Thacker. This case is not about emissions. It's not about a challenge to any regulation, federal or state. It's not a challenge to any permit. It's not a challenge to any treaty or contract or international behavior of any kind, and there is no relief sought outside of the city's jurisdiction in terms of equitable relief. The emissions are the avenue of the city's injury, but they're not the tort, and they're not the source of the tort, nor are they the target of the remedy. So the torts here are the failure to warn, campaign of deception and lying and denial, and the overpromotion and overmarketing of products these companies knew would cause untold harm. These cases are no more about emissions or regulation of emissions under the Clean Air Act or otherwise than are cases about opioids, about FDA approval of pain medication. In other words, the corporate bad behavior is the lying and the deceit and the denial and the failure to warn, and those are matters of traditional state concern. The fact that it's a large case that involves actions in many places doesn't make it a matter of federal issues, and we know that from the Fifth Circuit opinion in the Jackson case where the court determined that state law, not federal common law, governed in cases against asbestos manufacturers, and the court said a dispute cannot become interstate in the sense of requiring the application of federal common law merely because the conflict is not confined within the boundaries of a single state. And in the Agent Orange case out of the Second Circuit, state law, not federal common law, governed class action tort cases on behalf of millions of Vietnam veterans against the manufacturers of Agent Orange despite the federal interest both in the production and manufacture of Agent Orange and of course in the health of the veterans. There is no federal interest in uniformity, said the court, for its own sake. The fact that application of state law may produce a variety of results is of no moment. It is the nature of our federal system. That's exactly what we have here. It is a mischaracterization of our case, and you cannot fairly read our complaint to be a challenge to omissions by these defendants or others. It's a challenge to a deceptive and false advertising set of behaviors by manufacturers. Tell us why Noel has not been abrogated by Yamaha. Thank you, Judge Floyd. So the basic issue is that the Removal Clarification Act did not change the rule. All it did was insert language, the words 1442 or before Section 1443 with no other changes. So the addition of this exception, this additional exception to Section 1447D, doesn't alter the courts or this court or any other courts' numerous previous holdings that courts of appeals only have jurisdiction to review those bases for removal expressly exempted from the general statutory bar of going beyond what was previously the civil rights exception and now includes the federal officer exception. The rule before the Clarification Act was unanimous in every circuit, including this one in the Noel case, that looked at the issue. Raising an enumerated exception did not extend the ability of the court to look at any other issue encompassed within an order. And I think the language is not the same between Section 1447D and Section 1292B. 1292B refers to such order. 1447D refers to an order pursuant to the two enumerated sections. So it's limited to those grounds. There's also a big difference if you look at the policies and interests of the courts and of Congress in looking between the 1292B procedure and the 1447D procedure. 1447D makes reviewable issues that otherwise are blanket not reviewable, period, by the courts of appeals. Section 1292B, though, simply affects the timing of otherwise unquestionably reviewable issues that are encompassed within an order. And it also gives both the district court and the courts of appeals the discretion to either accept the interlocutory appeal or not, whereas under the defendant's read of 1447D, including even a dubious assertion of federal officer jurisdiction, would, of right, give rise to review of all the other issues or other asserted grounds for... What's your response to opposing counsel's federal officer jurisdiction with regard to the Navy base providing the contract and the impetus for the fossil fuel production here? So this was raised in their brief and then counsel reasserted it here today. Two points I'd like to draw the court's attention to, Judge Sacker. First, at joint appendix page 246, which... And by the way, the joint appendix is the only source of evidence about the operation of this reserve. And this is section 8 of the recitals. It's on JA246. Section 8 says, this contract does not and cannot in and of itself authorize the production of any of Navy's share of the oil, gas, natural gasoline, and associated hydrocarbons in the reserve, as distinct from standards portion. And you're reading from the contract between the Navy and Standard Oil. That's correct, Your Honor. So this is a limitation in the contract. The purpose of the contract, and as a different Standard Oil case, the one out of the Ninth Circuit, said that these kinds of pooling agreements are common in the industry because what they try to do is preserve the subsurface resource for the use of all of those who have interest. And what this contract does is it allows Standard to extract oil while protecting the ability of the Navy to extract oil if and when it ever needs it. But, and this is key, the Navy can't do that without a separate authorization from Congress. This section that I'm reading, section 8, continues, the production of the remainder of Standard's share in oil, Navy shares must accept for the purpose of protecting, conserving, maintaining, or testing the reserve be preceded by and based upon an authorization by joint resolution of the Congress as provided, and then it goes on, which hadn't happened. There's no evidence in the record that Congress ever authorized any further production out of this reserve. It seems to me that this is a right of first refusal on behalf of the Navy. It is. And take it they have not used it because, as you just said, they haven't gotten the Congressional approval. I don't know, Your Honor, whether they ever got Congressional approval or not. There's nothing in the record before you one way or the other. But it seems it would, this first refusal thing would make their argument a little weaker because it looks like, from the record, the oil companies are simply profiting for their own purposes from this reserve. That's right, Judge Floyd. And, in fact, if you go to the other section that they cite, which is misused by them in both the brief and today before you, Your Honor, at Joint Appendix 250, this is also in the same contract. It's section 4B. And this is the clause that the defendants claim the Navy requires Standard Oil to produce 15,000 barrels a day. And they say this is evidence of strict control. It's not. What this contract says is that until Standard receives its share of production from this zone, then they have to manage the reserve to maintain its ability to produce at least 15,000 barrels a day for the Navy's benefit, potentially in the future, until Standard Oil takes its share out. So this contract, Standard could have complied with the contract without ever extracting a single barrel of oil. So this contract doesn't provide evidence that the Navy ever required the defendants to do anything with respect to this. Now, the Outer Continental Shelf lease was- It allowed them to, but it didn't require them to. That's correct, Judge Thacker. It allowed them to extract an undifferentiated interest if they chose to do so. And, again, I don't know whether they did or not, but if they did, it was for their benefit, not the Navy's. What the contract requires them to do is to preserve enough so that the Navy, if it ever needs it in the future, could take its share. Does it make a difference that if the government chose by congressional approval to exercise that option, that it couldn't be done without the private companies, oil companies? Actually, what the contract provides is that the Navy can either do it itself or ask, but it doesn't require- So there's nothing in the record that would suggest, yea or nay, as to whether the government even has the capacity to do so. Capacity to produce the oil themselves. It says that the Navy can do it itself or it has the option of asking the defendants to help with it is what the contract says. So you think the government has the capacity to do that? Capacity to do it. Because your colleague says that the government is not able to do that. It depends solely on them. That's why they said they're de facto federal officers, because they're the only ones that have the capacity to do it. See, there's two points. There's capacity and authority. The government has the authority, but does it have the capacity? That's, I think, the point that they were making. Even if it has not been exercised, if it is or if it will be, then they still would have to do it. The government couldn't do it. There's nothing in the record to say that. Okay, just not there. Well, what the contract says is that it's the Navy's right to do it itself. And it gives the Navy the option of asking Standard to do it, and if they ask them, Standard has to do it. But there's nothing that shows that the government- Did you say if they ask that Standard has to do it? Did you say that? I did say it, and I'm trying to think if I meant it. Yeah, I'll give you a chance to-but that's what you said. Yeah, do you mean it? No, I think I misspoke, Your Honor. What it says is that it's the Navy's right to do it itself. Oh, okay. All right. And it preserves that right explicitly in the contract. All right. The Outer Continental Shelf lands that are governed by the CITCO leases, Your Honors, that's merely commercial production for the benefit of the companies, and it's strictly regulated, and there are proceeds that go in the form of royalties to the government. But it's no different from logging or grazing or mining on federal lands. And if the defendant's proposed approach here were adopted, it would open the floodgates to a whole slew of third parties operating on federal lands under federal permits and regulations and leases as designated federal agents, which they're not. And then the final one, the commercial provision of diesel and gas under the NEXTCOM contracts are simply providing off-the-shelf contracts. And as the Ninth Circuit held in the State of Washington case, that doesn't implicate any federal officer concerns. There's also stepping back a moment, two points I'd like to make. The first is that there's nothing about this relationship that bears on the causal connection to the conduct that's at issue in our cases, that is the deception, denial, and over-marketing. That's just, it's not in any of these documents that the government is directing the companies to do this. And this stands in strict contrast to the situation in Sawyer or some of the other government contractors. That's just cases where failure to warn claims were held to fall within the scope of the federal officer removal because there was evidence that the government had superior knowledge and had instructed the companies not to issue the warnings that the plaintiffs were looking for. That was expressly part of the Sawyer case as well as the Wilkinson case that the Supreme Court referred to in Washington. So you have a much higher degree of relationship there. And the final point is just this lack of causal connection to the actual claims in the complaint. Now, counsel says that they're implicated based on a selective cherry-picking of language from the complaint. It is true that there's a reference to global emissions and that the defendants are responsible for certain shares overall. But that is merely a data point in understanding that since the period of knowledge and culpability in the mid-60s, three-quarters of all of the emissions globally in history have occurred of oil and gas. On the causation issue, how do you respond to the company's argument about the relationship between the charge conduct and the city's design defect claim? So if you look at the design defect claim as well as the public nuisance claim, remember that we're looking at a manufacturer's liability here. And the point is that we raised a reasonable consumer's expectation standard. And the claim is that the false in this leading conduct by these defendants deprived an ordinary reasonable consumer of the ability to understand and that it was defective for that reason. The same is true for trespass, by the way. They argue that promotion isn't an element of a trespass claim. But the truth is that a manufacturer is liable for trespass only when they are virtually certain that their products will cause the problem. This is the lesson from the Second Circuit's opinion in the In Re MTBE Products Liability Litigation from 2013. Your Honors, the other issues of federal common law, the Supreme Court in both disclaimed that the federal law completely occupied this field. As did this court in 2010 in the North Carolina case. Those are ordinary preemption issues and they don't support removal. The case doesn't satisfy the standard under the grable factors because it's a well-read complaint in which there is no necessary federal issue for a court or a funder of fact to determine. There's clearly no complete preemption under the Federal Clean Air Act. No court has ever held that. And the other bases for purported jurisdiction are coming up short as well. Your Honors, this is a big case. It's an important case. I think both sides agree on that. But it does not involve the regulation of emissions. It involves matters that are at core state competency and any matters of federal preemption that are raised as offenses are competently to be handled, can be competently handled by state courts. And Your Honors should affirm the court below and send the matter back to state court in Maryland where it belongs. Thank you. Thank you, Mr. Shearer. Mr. Boucher. Your Honors, I'm going to start with that last point. This case is about emissions of greenhouse gases. And the counsel mentioned a fair reading of the complaint. I urge the court, the complaint is all about oil and gas production and the emissions that fall from that. And that's what allegedly causes global warming. Just only one sentence, this is page two of the complaint. They say that decades of scientific research show that pollution from the production and use of defendant's fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric CO2 concentration. But he says that the complaint doesn't involve the regulation of the emissions. That rather it is about, as the complaint alleges, the defendants engaging in a coordinated multi-front effort to conceal and deny their own knowledge of those threats and to discredit the growing body of publicly available scientific evidence, et cetera. They definitely make that allegation, Your Honor. But what they're saying is that without the emissions, without the oil and gas production, none of that would make any difference. And, again, on the strict liability, on the tort claim, there's no tort case that I know of that has held that promotion of a product. And, by the way, this is not like opioids. Oil and gas, the federal government requires that it be produced, including on our continental shelf. The city of Baltimore is burning a lot of fossil fuels. So it's so different. This is a socially useful product that we all depend on for our modern civilization. And that's what they're challenging. Well, now, in that Navy contract, though, reading from the site, the Paragraph 8 or Section 8, it certainly appears as though the Navy didn't require standard oil to extract the oil but rather allowed them to do it, sort of as Judge Floyd pointed out, a sort of right of first refusal. Well, it was a pretty lengthy contract and complicated and went over years. But it didn't end in 1920. In fact, on page 214 of the Joint Appendix in our Notice of Removal, we note that in 1976 Congress authorized and directed that the Elk Hills Reserve be produced at the maximum efficient rate for six years. And at that point the Navy started selling that oil and putting the proceeds into the U.S. Treasury. And so it went on. Wait, okay, that's in your Notice of Removal? Yes. It's page 244. Right, I see that. Well, actually, I see page 214. What is your support for that statement? Your Honor, it's in the Department of Energy website. And I don't think we cited it in there, but we gathered it from public source documents and reports at the time. The Navy decided, okay, let's open it up. But the public source documents aren't cited in here? We've not cited them in the Notice of Removal. So there's not a record basis for that? I think for that statement it's our Notice of Removal, Your Honor. But we'd be happy if the court thinks we need a fuller factual record to go back and supplement it. But the court can take judicial notice of what's on the Department of Energy website. We're happy to make a 28-J submission if the court would like more details on that. And as to the control, I mean – Well, if the Navy sold the oil, did they extract it or produce it? Or did Standard? Your Honor, my understanding, it was under this contract where it wasn't that Standard was just sort of waiting around. It was managing and operating an agreement, makes this clear, the entire reserve. And so once it's under this operating agreement, it then, as I understand it, did the extraction. And then the Navy, on behalf of the Navy, just like in Watson, it said they helped the Navy get its own oil and gas out of the ground and then sell it. So the Standard was acting as an agent of the government. And the contract couldn't be clearer. The Navy had – this is on page 249 – had exclusive control over the exploration, prospecting, and development. And so the third point I just want to go back to before my – Before you leave that, so you're arguing potentially that's – you have immunity then, you're claiming? That one of our defenses might be a government contract defense. And that's part of the federal officer removal analysis. Are we acting under a federal officer? Do we have a federal defense and a government contract? The government wanted to produce – to this day is producing – and there's a statute on the Outer Continental Shelf that says we want to extract these resources so we can defend our national security, to protect our economy. Are there alternative energy sources we should all be looking at and ways to address global warming? Yes. But in terms of a state saying that – and to Judge Backer's point, regulation by tort, they are seeking punitive damages. The Supreme Court has said when a state imposes punitive damages or compensatory damages, it's a form of regulation. It's meant to stop the conduct at issue. So, yes, it is regulation of emissions, oil and gas production. They are seeking to punish companies for producing oil and gas on federal land under direction of federal officers for the benefit of our national economy and our national security. Maryland can't do that, but for this purpose, it's a federal question under the Outer Continental Shelf Lands Act and the Federal Removal Statute and under the Federal Common Law. Thank you very much. Thank you, Counsel. We'll come down, Greek Council, and go to our next case. Thank you.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker